UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

-vs-                                        Case No.    5:06-cr-22-Oc-10

WESLEY TRENT SNIPES

_____/

## ORDER ON DEFENDANT'S PENDING MOTIONS

On February 1, 2008, after exhaustive pretrial litigation and fourteen days of trial, the jury returned its verdict.  The Defendant Snipes was convicted of three counts charging misdemeanor offenses involving willful failure to file his income tax returns for the years 1999, 2000 and 2001.  He was acquitted by the jury of other charged offenses, including two felonies.  The unanimity of the jury was confirmed by polling.

Sentencing was held on May 1, 2008.  Defendant Snipes was sentenced to consecutive terms aggregating three years imprisonment (Doc. 458).  He appealed, and was at liberty on bail pending appeal.  He remains at liberty now.

The Court of Appeals issued its opinion on July 16, 2010, affirming in all respects the Defendant's conviction and sentence.  United States v. Snipes, 611 F.3d 855 (11th Cir. 2010).  Petition for rehearing and rehearing en banc was denied on September 29, 2010, and the mandate issued on October 7, 2010 (Doc. 556).

In the meantime, on July 23, 2010, shortly after the Court of Appeals filed its opinion (but before issuance of its mandate), Defendant Snipes filed a motion for permission to interview jurors about possible misconduct (Doc. 527).[1]  This was followed a few days later, on August 3, 2010, by a second motion for permission to interview jurors (Doc. 530).

Additionally, on August 25 and 26, 2010, Defendant Snipes filed a motion and an amended motion under Rule 33, Federal Rules of Criminal Procedure, for a new trial (Docs. 538 and 541).

The United States has responded to each of these motions (see Docs. 532 and 546); and, after receipt of the mandate from the Court of Appeals, the Court scheduled and has heard the oral arguments of counsel.

Upon due consideration, for the reasons explained below, the Court has determined that each of the Defendant's foregoing motions should be, and will be, Denied.  The judgment of commitment will be enforced.

---

[1]     Local Rule 5.01(d), M. D. Fla. Rules, provides:

(d)     No attorney or party shall undertake, directly or indirectly, to interview any juror after trial in any civil or criminal case except as permitted by this Rule.  If a party believes that grounds for legal challenge to a verdict exist, he may move for an order permitting an interview of a juror or jurors to determine whether the verdict is subject to the challenge.  The motion shall be served within fourteen (14) days after rendition of the verdict unless good cause is shown for the failure to make the motion within that time.  The motion shall state the name and address of each juror to be interviewed and the grounds for the challenge that the moving party believes may exist.  The presiding judge may conduct such hearings, if any, as necessary, and shall enter an order denying the motion or permitting the interview.  If the interview is permitted, the Court may prescribe the place, manner, conditions, and scope of the interview.

A.    The motions concerning alleged juror misconduct.

Late on the evening of the very day that the Court of Appeals issued its widely

publicized opinion, July 16, 2010, two and a half years after the verdict, and over two

years after the imposition of sentence, defense counsel received an email from one

of the jurors, stating:

> Sent:        Friday, July 16, 2010 10:47 PM
> To:
> Cc:
> Subject:     I was on his jury, maybe I can help
>
> I served on the jury in Ocala that found him guilty on 3 counts of failing
> to file taxes.  It was a deal that had to be made because of certain jurors
> that had already presumed he was guilty before the trail [sic] started and
> we only found this out in the last few days of deliberation.  We thought
> we were making the right deal because we did not think he would go to
> jail for not filing taxes.  There were 3 on the jury that felt this way and told
> us he was guilty before they even heard the first piece of evidence going
> against what the judge had said.  If I can be of any help feel free to call
> me at
>
>                        Sincerely

This message, according to the defense motions,[2] was followed two weeks

later, on July 31, 2010, by a second email from another juror.  The second message

read:

> -----Original Message -----
> From:_____
> To: Dan Meachum
> Sent: Sat Jul 31 12:22:25 2010
> Subject: Wesley Snipes.
>
> Mr. Meachum,

---

[2]    The Court has no reason to doubt the veracity of defense counsel as officers of the Court, and their representations concerning receipt of these messages are accepted without further proof. Copies of the unredacted messages were presented at the hearing as Exhibits 2 and 3.

> I read an article pertaining to the trial.  I also was on the jury for his case.
> If you would like to contact me, you can reach me at this email address
> _____ Like the other email suggested, most of us didn't believe
> he would have received the jail time.  Thank you,.....................

The Defendant's motion for leave to interview the jurors, as well as the motion for a new trial, focus on the statement in the first email that certain jurors had "already presumed he was guilty before the trail [sic] started . . . ," and argues that, if this is true, the Defendant was denied a fair trial.  The email presents, to be sure, a troubling set of circumstances, but further pursuit of the issue is clearly foreclosed by Federal Rule of Evidence 606(b) and well established law.

"By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 2746 (1987).  An exception to that common law rule was "recognized only in situations in which an 'extraneous influence' was alleged to have affected the jury." Id. (quoting Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 53 (1892)).

"[T]o protect the jury system," Federal Rule of Evidence 606(b), made effective in 1975, "enshrine[s]" that common law rule and the limited exception to it.  United States v. Siegelman, 561 F.3d 1215, 1241 (11th Cir. 2009), vacated on other grounds, 130 S.Ct. 3542 (2010); see also Martinez v. Food City, Inc., 658 F.2d 369, 373 (5th Cir. Unit A Oct. 1981) (Rule 606(b) "is a codification of long-standing practice in federal courts").  As amended, Rule 606(b) provides:

(b) Inquiry into validity of verdict or indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.  A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

The rule thus prohibits a juror from testifying (or offering an affidavit) about any matter that occurred during deliberations except for extraneous prejudicial information, outside influence, or a mistake in entering the verdict onto the verdict form.  These are "very stringent limitations on [a district court's] authority to question jurors about their deliberations, and to use one or more juror's testimony to impeach the verdict of all." Siegelman, 561 F.3d at 1240; Washington v. Strickland, 673 F.2d 879, 905 (11th Cir. 1982) ("We have . . . held, in keeping with both Rule 606(b) and the long established common-law principles that underlie it, that post-verdict inquiries which seek to probe the mental processes of jurors are impermissible."); United States v. Duzac, 622 F.2d 911, 913 (5th Cir. 1980) ("Post verdict inquiries that seek to probe the mental process of jurors. . . are impermissible.") (citation and internal quotations marks omitted); United States v. D'Angelo, 598 F.2d 1002, 1004 (5th Cir. 1979) ("Severe limitations exist on all attempts 'to breach the shroud surrounding jury deliberations.'") (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977)).

"Rule 606(b) is a rule of evidence, but its role in the criminal justice process is substantive:  it insulates the deliberations of the jury from subsequent second-guessing by the judiciary." United States v. Benally, 546 F.3d 1230, 1233 (10th Cir. 2008), cert. denied, 130 S.Ct. 738 (2009).  In that regard, jury deliberations may be likened to a "black box:"

> Jury decision-making is designed to be a black box:  the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review.  Judges instruct the jury as to the law, but have no way of knowing whether the jurors follow those instructions.  Judges and lawyers speak to the jury about how to evaluate the evidence, but cannot tell how the jurors decide among conflicting testimony or facts.  Juries are told to put aside their prejudices and preconceptions, but no one knows whether they do so.  Juries provide no reasons, only verdicts.

Id. Although treating jury deliberations "as a black box may seem to offend the search for perfect justice" by making "it difficult and in some cases impossible to ensure that jury verdicts are based on evidence and law rather than bias or caprice," id., Rule 606(b) serves paramount interests that go to the core of our justice system, see Carson v. Polley, 689 F.2d 562, 581 (5th Cir. 1982).

Rule 606(b), for example, prevents harassment of jurors by losing parties seeking to nullify verdicts and, at the same time, serves to foster full and frank deliberations.  As the Supreme Court explained long ago:

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside

a verdict.  If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

McDonald v. Pless, 238 U.S. 264, 267-68, 35 S.Ct. 783, 784 (1915); accord Tanner, 483 U.S. at 120-21, 107 S.Ct. at 2748, ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct."); Benally, 546 F.3d at 1234 ("It is essential that jurors express themselves candidly and vigorously as they discuss the evidence presented in court.  The prospect that their words could be subjected to judicial critique and public cross examination would surely give jurors pause before they speak."); United States v. Griek, 920 F.2d 840, 843 (11th Cir. 1991) ("It is thus clear that the compelling government interest to be protected . . . is the right of criminal defendants to be tried by a jury whose deliberations cannot be exposed to public view except by a showing of outside influence[.]"); S. Rep. No. 93-1277 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7060 ("[C]ommon fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts.  Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation.").

Rule 606(b) also protects verdicts from endless attack, thereby preserving the "community's trust in a system that relies on the decisions of laypeople," Tanner, 483 U.S. at 121, 107 S.Ct. at 2748, and promoting much desired finality, Siegelman 561 F.3d at 1241; see also Tanner, 483 U.S. at 120, 107 S.Ct. at 2447 ("Allegations of

juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks or months after the verdict, seriously disrupt the finality of the process."); United States v. Venske, 296 F.3d 1284, 1292 (11th Cir. 2002) ("Equally important is the court's interest in preserving the finality of the jury's verdict."); Sims' Crane Serv., Inc. v. Ideal Steel Prods., Inc., 800 F.2d 1553, 1556 n. 9 (11th Cir. 1986) ("Absent Rule 606(b), jury verdicts would be open to continual attack."); S. Rep. No. 93-1277 ("Public policy requires a finality to litigation.").

Local Rule 5.01(d), M. D. Fla. Rules, works hand-in-hand with Rule 606(b) to serve many of those compelling interests; it prohibits any lawyer or party from interviewing a juror post verdict absent an order granting leave to do so based upon the belief that there are grounds for a legal challenge to the verdict. See Venske, 296 F.3d at 1291 (principal purpose of such rules "is to prevent 'fishing expeditions in search of information with which to impeach jury verdicts'") (quoting United States v. Davila, 704 F.2d 749, 754 (5th Cir. 1983)); United States v. Moten, 582 F.2d 654, 665 (2d Cir. 1978) (rules relating to post verdict juror interviews serve many of the same interests as rules relating to admission of jury testimony to impeach a verdict; "[a] serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts").

Here, a juror has alleged that other jurors expressed, <u>during deliberations</u>, a presumption of guilt formed before trial.  If true, maintenance of that state of mind would obviously be contrary to the Court's repeated instructions and should have been disclosed during <u>voir dire</u>, but it does not amount to an extraneous influence. The Eleventh Circuit decision in <u>United States v. Venske</u>, <u>supra</u>, is almost squarely on point in demonstrating that the claim made here is not a species of "outside influence."  There, an affidavit was offered that, among other alleged misconduct, one of the jurors "knew from the first day of trial that the [Defendants] were guilty."  296 F.3d at 1288.  The court held that this statement was "excluded by Fed. R. Evid. 606(b) because [it involves] the jury's deliberative process and the mental impressions of [the] juror . . . ", not extrinsic influence, 296 F.3d at 1290.[3]

It follows that the Court cannot consider the emails of the jurors - - indeed, they could not be considered even if they were proffered under oath in affidavit form.  And, because they cannot be considered, there is no basis for conducting any interviews of any members of the jury about their deliberations or their voir dire responses and no reason to conduct an evidentiary hearing.  By the same token, there is no basis for granting a new trial on the ground of juror misconduct.

---

[3]     It is also worthy of note, given the policies underlying the rule, that the veracity of the claim of juror misconduct in this case is undermined by the fact that the Defendant was acquitted of the most serious charges; that the complaining juror waited two and a half years before bringing the alleged misconduct to light; and the fact that the jurors' complaint was expressly motivated by the Defendant's sentence - - a consideration that, in itself, the jury was expressly instructed to disregard in arriving at its verdict.

The Defendant's motion (Doc. 527) and second motion (Doc. 530) for permission to interview jurors will be Denied as will the amended motion for a new trial (Doc. 541) to the extent that motion is based upon alleged juror misconduct.

B.      The motion for a new trial based upon non-disclosure of Brady material and a violation of Giglio.

Apart from the alleged juror misconduct, Snipe's motion for a new trial is also predicated upon an asserted Brady[4] and Giglio[5] violation disclosed by newly discovered evidence related to one of the Government's witnesses at trial, Kenneth Starr.[6]  The witness Starr was a non-practicing lawyer and accountant who was the principal of Starr & Co., a financial consulting business in New York serving affluent, celebrity clients.  Among other services, Starr's firm had given investment and tax advice to Snipes, and had prepared Snipes' tax returns for several years preceding 1999.  The core of Starr's testimony related to the termination in 2000 of his firm's representation of Snipes concerning tax matters because Snipes insisted upon his belief that he was not required to file income tax returns.

The present motion for a new trial focuses on two other legal proceedings in which Starr was involved, and contends that the prosecution in this case should have

---

[4]      Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").  See also, The Jencks Act, 18 U.S.C. § 3500.

[5]      Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972).

[6]      The witness Starr should not be confused with the former Solicitor General and Judge of the United States Court of Appeals having the same name.

produced information about both cases so that such information might have been used for purposes of impeaching Starr as a witness.

1.    <u>The Starr indictment</u>.  On May 26, 2010 - - two years and four months after the trial in this case - - a criminal complaint was filed against Starr in the Southern District of New York (Doc. 541, Ex. 1), followed by the return of an indictment against Starr in the same court on June 10, 2010 (<u>Id</u>., Ex 2).  The indictment consisted of twenty three counts.  Counts One through Twenty alleged separate wire fraud offenses in violation of 18 U.S.C. § 1343 arising out of the same factual scenario, namely, a scheme by Starr to misappropriate funds entrusted by his clients to his care.  The time period covered by these offenses was from July 14, 2009 (Count One) through April 26, 2010 (Count Twenty) - - the earliest alleged offense being over eighteen months <u>after</u> the trial of this case.  Count Twenty One alleged a money laundering offense in violation of 18 U.S.C. § 1956(a)(1) charged to have been committed during the period of January, 2009, through April, 2010 - - the earlier date being eleven months <u>after</u> the trial of this case.  Count Twenty Two alleged an investment fraud offense in violation of 15 U.S.C. §§ 80b-6 and 80b-17, and Count Twenty Three alleged a securities fraud offense in violation of 15 U.S.C. §§ 78g(b) and 78ff(a), that occurred from in or about 2005 through April, 2010, spanning the time during which this case was filed and tried.[7]

---

[7]    Snipes was indicted in early 2006 and the case was tried in early 2008.

Pursuant to a written plea agreement dated September 7, 2010 (Doc. 546-4),

Starr entered a plea of guilty on September 10, 2010 to Counts 9, 21 and 22 of his

indictment (Doc. 559-1) and is presently awaiting imposition of sentence.

In response to the motion for a new trial, the Government has filed, inter alia,

a declaration by IRS Special Agent Robert Beranger, under penalty of perjury, that:

> In July 2009, as a result of information received in May
> 2009, the IRS and the United States Attorney's Office for
> the Southern District of New York (USAO SDNY)
> commenced a criminal investigation regarding, among other
> things, a Delaware corporation named Wind River LLC and
> its principal officer, Andrew Stein.  Only later did Kenneth
> Starr's name surface in connection with that investigation.

Additionally, in their motion papers - - and orally during argument - - counsel for

the United States have declared as officers of the Court that the witness Starr was not

being investigated and was not a "target" or otherwise under suspicion at the time of

Snipes' trial; and, of course, even more importantly, it follows that Starr had not been

informed, directly or indirectly that he was under any criminal scrutiny.  Snipes has no

evidence to the contrary and the Court sees no need to conduct any evidentiary

proceedings concerning the matter; it would be a classic fishing expedition.  See

United States v. Massey, 89 F.3d 1433, 1443 (11th Cir. 1996) (no abuse of discretion

where district court denied evidentiary hearing on a Brady claim where the claim

lacked any merit); United States v. Elso, 364 Fed. Appx. 595, 2010 WL 438364,*3

(11th Cir. Feb. 8, 2010) ("[T]he court did not abuse its discretion in denying [the motion

for new trial] without conducting an evidentiary hearing because the resolution of the

<u>Brady</u> claim was clear, and [the Defendant] failed to offer any objective evidence in support of the claim).

      2.    <u>Starr's involvement in the case of United States v. Pellicano</u>.  It appears that, in February, 2002, Starr was sued by one of his well known celebrity clients, Sylvester Stallone.  During the course of that lawsuit, Starr (or his counsel in the case) employed a private investigator named Anthony Pellicano.  Subsequently, in 2005, Pellicano was indicted in the Central District of California for, among other charges, an unlawful wiretapping of Sylvester Stallone's telephone.  Starr was listed as a witness, but, according to the Government, he was never himself a target in the Pellicano case and was never told that he might be.  Besides, this matter was raised at Snipes' trial and was ultimately excluded by the Court on the ground that cross examination of Starr concerning his alleged uncharged complicity with Pellicano would be "under Rule 608 of the Federal Rules of Evidence . . . collateral impeachment at best."  (Doc. 383, page 156.)  This ruling was not made an issue in Snipes' appeal.

      The Court thus concludes that Defendant Snipes' motion for a new trial based upon an alleged <u>Brady</u>/<u>Giglio</u> violation is due to be denied.  There is simply no credible showing that the prosecution ever suppressed any then existing <u>Brady</u> or Jencks Act information (or failed to correct perjured testimony as required by <u>Giglio</u>), and no reason to conduct an evidentiary hearing that would be anything more than a fishing expedition.

      In any event, the motion for a new trial fails for other reasons as well.

To obtain a new trial based on an alleged <u>Brady</u> violation, a defendant must establish four elements:  (1) the prosecutor possessed evidence favorable to the defendant (including impeachment evidence); (2) the defendant had not possessed the evidence and could not have obtained the evidence with any reasonable diligence; (3) the prosecutor suppressed the evidence; and (4) there is a reasonable probability that the outcome would have been different if the prosecutor had disclosed the evidence to the defendant.  <u>United States v. Bagley</u>, 473 U.S. 667, 674-75, 105 S.Ct. 3375, 3379-80 (1985); <u>United States v. Vallejo</u>, 297 F.3d 1154, 1164 (11th Cir. 2002).

A <u>Giglio</u> violation is a "species" of a <u>Brady</u> violation.  <u>Ventura v. Att'y Gen., Fla.</u>, 419 F.3d 1269, 1276 (11th Cir. 2005).  To obtain a new trial based on an alleged <u>Giglio</u> violation, a defendant must establish three elements:  (1) the prosecution used perjured testimony (or failed to correct what it later learned was perjured testimony); (2) the prosecutor acted knowingly; and (3) the perjured testimony is material.  <u>Vallejo</u>, 297 F.3d 1163-64; <u>accord</u> <u>Tompkins v. Moore</u>, 193 F.3d 1327, 1339 (11th Cir. 1999). Perjured testimony is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  <u>United States v. Dickerson</u>, 248 F.3rd 1036, 1041-42 (11th Cir. 2001) (internal quotations and citations omitted).[8]

---

[8]     A district court should use the <u>Brady</u> and <u>Giglio</u> standards instead of the general new trial standard if a defendant's newly discovered evidence concerns an alleged <u>Brady</u> or <u>Giglio</u> violation. <u>United States v. Cook</u>, 170 F. Appx. 639, 640, 2006 WL 622576*1 (11th Cir., Mar. 14, 2006) (district court erred by evaluating new trial motion "using the standard for a Rule 33 motion based on newly discovered evidence instead of a Rule 33 motion based on <u>Brady</u> evidence").

Here, even if all of the information about Starr's illegal activities had been known and disclosed at trial there is absolutely no reasonable probability that the outcome of the trial would have been different (the <u>Brady</u> test)[9] or that the absence of such information undermines confidence in the verdict (the <u>Giglio</u> standard).

The alleged <u>Brady</u> material relates only to impeachment of Starr as a witness, as distinguished from being direct, exculpatory evidence; and, despite Snipes' present hyperbolic characterization of Starr as the Government's "chief" witness at trial, his testimony was cumulative in nature and addressed one issue - - namely, Snipes' awareness of his obligation to file income tax returns. There were three other witnesses who testified to the same effect,[10] and an abundance of other evidence reflecting Snipes' state of mind when he chose not to file his tax returns for 1999-2001.

C.    <u>Conclusion and Enforcement of the Judgment</u>.

1.    The motion for permission to interview jurors (Doc. 527) and the second motion for leave to interview jurors (Doc. 530), are both DENIED.

2.    The amended motion for a new trial (Doc. 541) is, in all respects, DENIED.

---

[9]    The "reasonable probability" standard is substantially the same as the classic "harmless error" standard.  The Eleventh Circuit has used both standards interchangeably.  For example, in <u>United States v. Jones</u>, 601 F.3d 1247, 1266 (11th Cir. 2010), the Eleventh Circuit applied the harmless error standard to challenges under both the Jencks Act and <u>Brady</u>.  <u>See</u> <u>also</u> <u>United States v. Beasley</u>, 2 F.3d 1551, 1557 (11th Cir. 1993)("The harmless error doctrine is applicable to Jencks Act violations, but it must be strictly applied.").

[10]    Starr's testimony about Snipes' election not to file tax returns was cumulative of at least three other witnesses:  two employees of Starr and Co. (Ronald Starr and Michael Canter), and Snipes' own bookkeeper (Carmen Baker) who had left Starr & Co. to work for Snipes.

3.      The judgment of commitment entered on May 1, 2008 (Doc. 458) has been affirmed in all respects by the United States Court of Appeals (Doc. 556) issued as a mandate on October 7, 2010 (Id.).

4.      The judgment of commitment is due to be, and is, ENFORCED pursuant to the mandate of the Court of Appeals.  The motion of the United States to revoke bail (Doc. 526) is GRANTED, and the Defendant's Motion for Bail Pending Rule 33 Motion (Doc. 529) is DENIED.  See United States v. Kelly, 790 F.2d 130, 139 (D.C. Cir. 1986) (The Bail Reform Act of 1984 does not provide for bail pending appeal from the denial of a motion for new trial made pursuant to Fed. R. Crim. P. 33); Cherek v. United States, 767 F.2d 335, 337-38 (7th Cir. 1985) (The Bail Reform Act does not apply to a convicted defendant seeking post conviction relief.).  To the extent that the Court has inherent discretion to grant bail pending an application for certiorari and/or an appeal from denial of a post-affirmance motion for a new trial, the Court would, and does, exercise that discretion against granting any further delay in the execution of the judgment entered over two and a half years ago.  The Defendant Snipes had a fair trial; he has had a full, fair, and thorough review of his conviction and sentence by the Court of Appeals; and he has had a full, fair, and thorough review of his present claims, during all of which he has remained at liberty.  The time has come for the judgment to be enforced.

5.      The Defendant, Wesley Trent Snipes, is ORDERED AND DIRECTED to surrender  himself for execution of sentence upon receipt of notice from the United States Marshal or the Bureau of Prisons as to where, when and to whom he should report for that purpose.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida, this 19th day of November, 2010.

_____

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record
              Maurya McSheehy